UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. 2:10-CR-648 |
| | § | (CIVIL ACTION NO. 2:12-CV-406) |
| MONTE LEE ARMSTRONG; aka | § | |
| ARMSTRONG | § | |

**ORDER DENYING MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE,
DENYING CERTIFICATE OF APPEALABILITY, AND
DENYING MOTION TO APPOINT COUNSEL**

Pending before the Court is Defendant Monte Lee Armstrong's (Armstrong) motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255, along with his memorandum of law in support and medical information memorandum. D.E. 69, 70, 71.[1] As part of Armstrong's filing, he requests appointment of counsel to assist him in the presentation of this motion. The government filed its motion to dismiss. D.E. 74. Armstrong did not file a reply.

For the reasons set forth herein, Armstrong's motion for appointment of counsel is DENIED, his § 2255 motion is DENIED, and the Court also DENIES him a Certificate of Appealability.

## I.  JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 2255.

## II.  FACTUAL BACKGROUND AND PROCEEDINGS

Armstrong was stopped at the Sarita, Texas Border Patrol checkpoint in June 2010 for an immigration inspection. D.E. 55 at 9-11. Border Patrol Agent Garcia performed an immigration check. He then asked Armstrong and his passenger where they picked up their load. Both said

---

[1]  Docket entry references are to the criminal case.

they did not recall. Id. at 11-12. When asked for his paperwork, Armstrong hesitated, but provided a single unsigned sheet of paper that reflected he was loaded at J&D Produce in Edinburg, Texas around midnight. Id. at 12-13.

Agent Garcia asked Armstrong for permission to x-ray his tractor. Armstrong agreed. Id. at 15. The x-ray revealed anomalies in the load. Id. Other agents searched the tractor and found marijuana. Id. at 16. Armstrong was arrested. He declined to speak to agents. D.E. 1.

The day after his arrest, Armstrong was brought before a federal Magistrate Judge and appointed counsel. D.E. 2, 5. He was indicted on June 29, 2010, and arraigned a few days later. He was charged with possession with intent to distribute more than 1000 kilograms of marijuana, (1196.2 kilograms (gross weight)) in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A). After indictment and before trial, Armstrong replaced appointed counsel with retained counsel. D.E. 18.

The case proceeded to trial on September 8, 2010. D.E. 54, 55. During trial, other evidence was elicited regarding the details of Armstrong's trip.

Agent Garcia testified that the drug dog on duty that night did not alert to Armstrong's trailer. D.E. 55 at 16. The contraband was loaded in large cardboard boxes that had both cabbage and marijuana in them. Id. at 21. Only one covered box did not have cabbage, only marijuana. Id. Garcia admitted that from the rear of the trailer, the marijuana was not visible. Id. at 22. When the trailer was unloaded, the first boxes unloaded were parsley, onions, cilantro, mint, and scallions that were all packaged in ice. Id. at 23-24. The produce was also shrink wrapped in plastic. Id. at 24. Neither Armstrong nor his passenger had any contraband on their persons or in the tractor. Id. at 26. 2500 pounds of marijuana was removed from the trailer. Id. at 33. According to the operator of the x-ray machine, the contraband was well concealed; the

marijuana was in the boxes on the lower pallets approximately halfway back in the trailer. Id. at 34, 41. The agent did not smell marijuana coming from the trailer. Id. at 37.

An employee of J&D Produce testified that J&D is a packing shed in Edinburg, Texas. They grow produce, pack it, and ship to customers. Id. at p. 53. They have 30 loading docks. The warehouse operation was open from 8 a.m. until as late as 11 p.m. during the season from October until the middle of July. Ordinarily the warehouse was closed on Sunday. Id. at 53-54.

J&D uses bills of lading that are on letterhead, have a customer number, the name of a salesman, phone number, destination, a description of the load, the temperature for the load, and is signed on the bottom by the driver. Id. at 55-56. The bills of lading are four pages; two pages go to the driver and two stay in the shipping office. Id. at 56. The witness from J&D looked at the bill of lading provided by Armstrong to Agent Garcia and denied that it was the form that J&D used. He provided a sample of the form J&D used. Id. He testified that his warehouse was not open at midnight on Sunday June 13, 2010. Id. at 56-57. The witness also checked J&D's records and the bill of lading number did not correspond to their numbering system. Additionally, J&D did not carry some of the products listed on Armstrong's bill of lading. Id. at 57. The witness further denied that J&D shipped to Geronimo's Produce, the customer listed on Armstrong's bill of lading. Id. at 58.The boxes used for the produce in Armstrong's trailer were different from the boxes J&D used. Id.

Wanda Byrd, Armstrong's passenger, testified that she had known Armstrong six or seven years and had known his wife for twenty years. D.E. 55 at 66. Armstrong owned a trucking company. Id. at 68. Byrd did not have a commercial driver's license, had not done this kind of work before, and admitted that she was not familiar with bills of lading. Id. at 67, 80. She and Armstrong began their trip in North Carolina approximately four or five days before they

were stopped at the Sarita Border Patrol checkpoint. Id. Byrd was traveling with Armstrong because he does not read or write. He needed help with the paperwork and the GPS. Id. at 68. During the trip, they picked up and dropped off four loads of cargo before Armstrong was arrested. Id. Although Armstrong signed documents along the way, Byrd read them to him before he signed. Id. at 70. Armstrong sometimes had telephone conversations while in the truck cab with Byrd, but he also sometimes had private conversations. Id. at 70. They stopped in San Antonio to get the truck clutch repaired before they drove to South Texas. Id. at 70-71.

Armstrong and Byrd traveled to South Texas to pick up a load. Byrd did not know where they went, but she entered the information that Armstrong gave her into the truck GPS. Id. They arrived at a warehouse loading dock on approximately June 12th and loaded cargo. That location had 20 loading docks. Byrd did not get out of the truck. Id. at 72. They received shipping documentation at the warehouse, the same document she gave to a Border Patrol Agent. After they left the loading dock, they stopped to have the truck air conditioner repaired. Then Armstrong told Byrd it would be a little longer before they could get the second load. They drove to a second warehouse and waited approximately three hours until their load was ready. Id. at 74.

Joe Garza testified that he serviced Armstrong's truck air conditioner in Hidalgo, Texas on Sunday, June 13, 2010. He got the call around 1 p.m. in the afternoon and finished the service work between 3 and 3:30 p.m. Armstrong and Byrd were approximately 15 miles from J&D Produce when he met them. Id. at 86.

Border Patrol Agent DeLuna testified that he was called in after the contraband was found in Armstrong's trailer and Armstrong was arrested. Agent DeLuna searched the cab of the truck and found additional bills of lading associated with earlier loads. Id. at 89. DeLuna testified that the bill of lading Armstrong provided from J&D Produce was not consistent with other bills

of lading in Armstrong's truck. Id. at 97-98. DeLuna attempted to contact Geronimo's Produce, the destination on the purported J&D bill of lading. When he checked the phone number against published numbers for Geronimo, the number on the bill of lading was slightly different than the number for Geronimo's Produce. Id. at 99.

A DEA forensic chemist testified that the samples from the contraband seized were marijuana. Id. at 110. The government rested its case.

The defense did not put on evidence. Before the lunch break, the Court discussed with Armstrong his right to testify and his right to remain silent,

> 4 THE COURT: All right. May I see at the podium,
> 5 please, Mr. Armstrong?
> 6 THE DEFENDANT: Yes, Your Honor.
> 7 THE COURT: I'll let you rest in front of the jury,
> 8 if that's all right, unless you don't want to. That's fine.
> 9 MR. GUERRA: That's fine, Your Honor.
> 10 THE COURT: Which?
> 11 MR. GUERRA: Oh, this is fine. We rest just like
> 12 this. This is fine, Your Honor.
> 13 THE COURT: Okay. Mr. Armstrong, your attorney has
> 14 told me that you've elected not to testify. I want to make
> 15 sure that you understand that you have a right to testify if
> 16 you choose to do so to tell your own view of the case. You
> 17 also have the right not to testify, and no inference or
> 18 suggestion can be drawn from your election not to testify. Do
> 19 you understand that?
> 20 THE DEFENDANT: Yes. Yes, Your Honor.
> 21 THE COURT: Now, if the worst case scenario happens
> 22 and you get convicted and you're sitting up in the Bureau of
> 23 Prisons thinking, "If only I had testified, if only my lawyer
> 24 had let me testify, things would be different." Do you
> 25 understand that?
> 1 THE DEFENDANT: Yes. Yes, Your Honor.
> 2 THE COURT: You have to speak up.
> 3 THE DEFENDANT: Yes, Your Honor.
> 4 THE COURT: I don't want that to happen to you. So
> 5 you tell me, I want to make sure that this decision not to
> 6 testify is yours and yours alone. Is it?
> 7 THE DEFENDANT: Yes, Your Honor.
> 8 THE COURT: You're positive?

9 THE DEFENDANT: Yes, Your Honor.

Id. at 114.

The jury found Armstrong guilty. D.E. 29. After the jury convicted Armstrong, the Court ordered a Presentence Investigation Report (PSR). D.E. 30. Armstrong filed a request (written by his wife) to relieve his present counsel because he no longer trusted him. D.E. 32. A brief hearing was held and the Court granted the motion to substitute. ERO October 20, 2010 at 11:41, D.E. 34.

The Probation Department prepared the Presentence Investigation Report (PSR). D.E. 35. Armstrong's base offense level of 32 was calculated on a drug quantity of 1096.2 kilograms of marijuana. Id. at ¶ 15. Because Armstrong contested the charges against him, he did not receive credit for acceptance of responsibility. Id. at ¶ 21. Armstrong had no scored criminal history, although between 1985 and 2003, he had multiple convictions that included, Reckless Driving, Felony Fraudulent Burning of a Building, Felony Conspiracy, Felony Insurance Fraud, Felony Sale and Delivery of a Controlled Substance, a second Felony Insurance Fraud, Misdemeanor Domestic Violence Protective Order, and Trespass and Communicating Threats. See id. at ¶¶ 26-42. Armstrong's guideline range of imprisonment was 121 to 151 months imprisonment, with a minimum statutory sentence of 10 years imprisonment. Id. at ¶¶ 97-98. The Probation Department suggested that the Court consider departing upwards because Armstrong's criminal history appeared to be significantly underrepresented.[2] Id. at ¶ 114. Counsel filed no objections to the PSR.

---

[2]       In this instance, although the defendant has no criminal history points, he does have 16 prior convictions, of which five were felony convictions. It is noted that one of the defendant's prior convictions was for sale or delivery of a controlled substance, and another was for burning a building, the equivalent of arson. Had the defendant received criminal history points for those convictions, he would be a career offender, and would

Sentencing was held on December 12, 2010, with Armstrong's new counsel. D.E. 56. During sentencing, Armstrong complained that his elbow was swollen and his fingers were numb. Armstrong testified that he injured his elbow when he fell at the jail. The Court ordered medical treatment and ordered that he be transferred to a different facility. D.E. 56 at 4-7.

Armstrong testified that he had the PSR, it had been read to him, and he reviewed it with counsel who answered all his questions. Id. at 8-9. He was satisfied with counsel's advice and efforts. Id. at 9. Armstrong agreed that the PSR was correct. Id. at 13.

Armstrong complained that trial counsel prevented him from testifying at trial. Armstrong claimed they argued about Armstrong's changed decision to testify during the lunch recess; he claimed counsel told him he could testify after lunch, but when they returned, counsel did not move to reopen the evidence. Armstrong also complained that his wife was not allowed to testify and that trial counsel wanted him to commit perjury. Id. at 9-12.

---

face a guideline range of 360 months to life imprisonment. Additionally, the defendant had several charges in which he was convicted initially, and then the charges were dismissed after the defendant filed an appeal. It is believed that criminal history category I may substantially under-represent the seriousness of the defendant's prior criminal conduct or the likelihood that the defendant will commit further crimes.

Id.

The Probation Department and the government recommended a high end guideline sentence or upward departure due to Armstrong's 16 unscored convictions. Defense counsel asked the Court to consider a low end guideline sentence. He explained that Armstrong debriefed, but the agent was not interested in him as a witness because he did not acknowledge his guilt in the present offense. Id. at 16. The Court sentenced Armstrong to a mid-range guideline sentence of 135 months imprisonment, five years supervised release, no fine and a $100 special assessment. Id. at 17. The Court advised Armstrong of his right to appeal within 14 days. Id. at 18.

Armstrong appealed. D.E. 45. The Fifth Circuit affirmed the judgment and sentence. D.E. 65. Armstrong filed a motion to amend the PSR and sentence. D.E. 62. The Court denied the motion. D.E. 66. Armstrong filed his motion to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255. D.E. 69. It is timely.

### III. MOVANT'S ALLEGATIONS

Armstrong brings multiple claims of ineffective assistance of counsel in Ground One claiming that  counsel failed to, 1) investigate, 2) present exculpatory evidence of duress, and 3) present a defense, all as the result of a conflict of interest. D.E. 69 at p. 5.

In Ground Two, Armstrong claims that counsel failed to recognize and investigate Armstrong's diminished capacity. Armstrong also claimed he was unfit to stand trial because he was under the influence of legally administered drugs. Id. at p. 15.

Ground Three complains that Armstrong lacked competency to stand trial that was ignored by the Court, the prosecutor and defendant's counsel. Id. at p. 17.

Armstrong next complains that appellate counsel was ineffective. D.E. 69 at 21, 70 at 2.

The government urges this Court to dismiss the motion to vacate on the grounds that the record conclusively demonstrates that his claims are without merit. D.E. 74 at 13.

## IV.  MOTION FOR APPOINTMENT OF COUNSEL

Armstrong requests counsel on the grounds that he is illiterate and needs help to put his § 2255 motion into better order. D.E. 70 at 2-3. A section 2255 movant is not automatically entitled to appointed counsel. See United States v. Vasquez, 7 F.3d 81, 83 (5th Cir. 1993); see also Pennsylvania v. Finley, 481 U.S. 551, 555 (1987) ("We have never held that prisoners have a constitutional right to counsel when mounting collateral attacks upon their convictions. Our cases establish that the right to appointed counsel extends to the first appeal of right, and no further.") (citation omitted). There are certain situations in the course of section 2255 proceedings in which the Court is required to appoint counsel. See, e.g., Rules Governing § 2255 Proceedings 8(c) (2013) (hereinafter "the § 2255 Rules") (requiring that counsel be appointed upon determination that an evidentiary hearing is required); id at Rule 6(a) (court must assign counsel to financially eligible defendants "[i]f necessary for effective discovery"). Neither of the situations in Rules 6 and 8 are present here. The motion for appointment of counsel is denied.

## V.  ANALYSIS

### A.    28 U.S.C. § 2255

There are four cognizable grounds upon which a federal prisoner may move to vacate, set aside, or correct his sentence: 1) constitutional issues, 2) challenges to the district court's jurisdiction to impose the sentence, 3) challenges to the length of a sentence in excess of the statutory maximum, and 4) claims that the sentence is otherwise subject to collateral attack. 28 U.S.C. § 2255; United States v. Placente, 81 F.3d 555, 558 (5th Cir. 1996). "Relief under 28 U.S.C. § 2255 is reserved for transgressions of constitutional rights and for a narrow range of

injuries that could not have been raised on direct appeal and would, if condoned, result in a complete miscarriage of justice." United States v. Vaughn, 955 F.2d 367, 368 (5th Cir. 1992).

**B.      Standard for Claim of Ineffective Assistance of Counsel**

Generally, an ineffective assistance claim presented in a § 2255 motion is properly analyzed under the two-prong analysis set forth in Strickland v. Washington, 466 U.S. 668 (1984). United States v. Willis, 273 F.3d 592, 598 (5th Cir. 2001). To prevail on a claim of ineffective assistance of counsel, a movant must demonstrate that his counsel's performance was both deficient and prejudicial. Id. This means that a movant must show that counsel's performance was outside the broad range of what is considered reasonable assistance and that this deficient performance led to an unfair and unreliable conviction and sentence. United States v. Dovalina, 262 F.3d 472, 474-75 (5th Cir. 2001). To show that his attorney's performance at sentencing in a noncapital case was prejudicial under Strickland, the movant must demonstrate that counsel's error led to an increase in the length of his imprisonment. Glover v. United States, 531 U.S. 198, 203 (2001); United States v. Herrera, 412 F.3d 577, 581 (2005).

If the movant fails to prove one prong, it is not necessary to analyze the other. Armstead v. Scott, 37 F.3d 202, 210 (5th Cir. 1994) ("A court need not address both components of the inquiry if the defendant makes an insufficient showing on one"); Carter v. Johnson, 131 F.3d 452, 463 (5th Cir. 1997) ("Failure to prove either deficient performance or actual prejudice is fatal to an ineffective assistance claim.").

"The entitlement to effective assistance does not end when the sentence is imposed, but extends to one's first appeal of right." United States v. Williamson, 183 F.3d 458, 462 (5th Cir. 1999) (citing Evitts v. Lucey, 469 U.S. 387, 394 (1985); Green v. Johnson, 160 F.3d 1029, 1043 (5th Cir.1998)). Counsel's appellate performance is judged under the same Strickland, standard

applicable to trial performance. 466 U.S. 668 (1984). "When a claim of ineffective assistance of counsel is premised on counsel's failure to raise an issue on appeal, 'the prejudice prong first requires a showing that [the Fifth Circuit] would have afforded relief on appeal.'" United States v. Reinhart, 357 F.3d 521, 530 (5th Cir. 2004) (quoting United States v. Phillips, 210 F.3d 345, 350 (5th Cir. 2000)).

## C.   Alleged Conflict of Interest by Trial Counsel

Armstrong claims that his trial counsel was hired by a "Mr. West." West allegedly hired Armstrong's company to carry the load of produce and contraband without telling Armstrong about the contraband. D.E. 69 at 5-12. In support of his claim, Armstrong alleges that his trial counsel forged Armstrong's name on a motion to substitute counsel. D.E. 70 at 5. Armstrong also produced a copy of a letter that trial counsel wrote to Armstrong's wife. D.E. 69 at 14.

"Where a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest." Cuyler v. Sullivan, 446 U.S. 335, 344 (1980). An attorney owes his criminal defense client the duty of loyalty and the duty to avoid conflicts of interest. Strickland v. Washington, 466 U.S. 668, 688 (1984) (citing Cuyler, 446 U.S. 335).

The classic divided loyalties case is Wood v. Georgia, 450 U.S. 261, 270-72 (1981) (employer paid legal fees and controlled defense of employees accused of crime). A conflict of interest exists when defense counsel places himself in a position conducive to divided loyalties, such as when an attorney owes loyalties to a party whose interests are adverse to those of the defendant. See Mitchell v. Maggio, 679 F.2d 77, 79 (5th Cir. 1982). Such an interest is adverse when it is shown that "the attorney owes a duty to the defendant to take some action that could be detrimental to his other client." Id.

In <u>Wood</u>, the employer had an interest in securing favorable legal precedent, and paid legal counsel who sacrificed the rights of the employee defendants in favor of the employer's interests. <u>Wood</u>, 450 U.S. at 271-72. The <u>Wood</u> court recognized "the inherent dangers that arise when a criminal defendant is represented by a lawyer hired and paid by a third party, particularly when the third party is the operator of the alleged criminal enterprise." <u>Id.</u> at 269. "One risk is that the lawyer will prevent his client from obtaining leniency by preventing the client from offering testimony against his former employer or from taking other actions contrary to the employer's interest." <u>Id.</u> The <u>Wood</u> Court remanded for further factual development, "If the court finds that an actual conflict of interest existed at that time, and that there was no valid waiver of the right to independent counsel, it must hold a new revocation hearing that is untainted by a legal representative serving conflicting interests." <u>Id.</u> at 273-74. The burden is on the defendant seeking relief to prove to the Court by a preponderance of the evidence the grounds for relief. <u>Johnson v. Zerbst</u>, 304 U.S. 458, 468-69 (1938).

Armstrong claims that new trial counsel forged his name on the motion to substitute counsel. The motion, D.E. 17, was filed electronically and reflects in type that Armstrong gave permission for trial counsel to sign on his behalf as did counsel appointed to represent Armstrong. During sentencing, Armstrong testified,

> 2 THE DEFENDANT: Yes, Your Honor, very much so. The
> 3 first attorney I was not.
> 4 THE COURT: Who represented you in the trial?
> 5 THE DEFENDANT: I don't know what his name is.
> 6 MR. PENA: He was an attorney from the Valley, whose
> 7 name I can't remember.
> 8 MR. MARTINEZ: Your Honor, I believe it was --
> 9 THE COURT: Alejandro Guerra. Thank you, Ms. Cayce.
> 10 THE DEFENDANT: *I hired him -- well, my family hired*
> 11 *him, and he forged my name to paperwork that I didn't tell him*
> 12 *to do. He --*
> 13 THE COURT: Like what?
> 14 THE DEFENDANT: My attorney was -- he was sitting

15 right over there. My court-appointed attorney I had that you
16 ordered me, and *my family come up with money to hire me another*
17 *attorney, and they hired him, and he come up here and signed*
18 *papers releasing that other attorney, and I didn't tell him to.*
19 *And I found out about this, my attorney here told me that there*
20 *was a paper filed saying that I told him to sign my name to it.*
21 *And I didn't do no such thing. . . .*
             *       *       *       *
18 at my trial? *And I paid him, my family paid him all their*
19 *savings, all my sisters, my family had, $15,000.*
20 THE COURT: How much?
21 THE DEFENDANT: $15,000. And he come to see me one
22 time for about 30 minutes, another time about 15 minutes, and
23 the trial lasted about three-and-a-half hours. $15,000. And
24 then doing that to me.

D.E. 56 at 9, 11 (emphasis added).

Additionally, Armstrong claims that "Mr. West" set him up and hired his lawyer. In support, Armstrong attached a letter from counsel to Armstrong's wife that states in part, "I would like to take the opportunity to thank you and Mr. West for placing your trust in me," but does not state who paid his fee.

Armstrong's claim that West paid his attorney, contradicts his previous testimony at sentencing that his family paid trial counsel $15,000. Armstrong's sworn statements in open court are entitled to a strong presumption of truthfulness. Blackledge v. Allison, 431 U.S. 63, 74 (1977). Armstrong's evidence of divided interests here is slight and contradictory. Armstrong has not established that his trial counsel operated under a conflict of interest.

D.     **Claims That Counsel Was Ineffective**

1. *Failure to call witnesses*

Armstrong complains that counsel did not call witnesses to testify. He does not identify which witnesses would have testified to favorable facts, what those facts would have been, and whether the witnesses would have been cooperative and available.

Armstrong also claims expert testimony was available regarding trucking practices that would have helped him by supporting Armstrong's claim that he could not have known what was in his trailer and could not have observed the loading of his truck. He claims the expert could have corroborated the lack of address information in the warehouse area and confirmed that the format of the bill of lading was not unusual. Armstrong does not identify any trucking expert who was willing and available to testify to those facts.

At sentencing, Armstrong complained that his wife was not permitted to testify. Armstrong attached an unsigned "supporting affidavit" from his wife Tammy Armstrong. The Court may not consider the document because it is unsigned and unsworn. D.E. 70 at p. 16-17. See United States v. Gonzalez, 493 Fed. App'x. 541, 544 (5th Cir., Oct. 2, 2012) (per curiam) (designated unpublished) (citing United States v. Lghodaro, 967 F.2d 1028, 1030 (5th Cir. 1992)).

In general, "complaints of uncalled witnesses are not favored . . . ." in post-conviction proceedings. Harrison v. Quarterman, 496 F.3d 419, 428 (5th Cir. 1997). "[W]hen 'the only evidence of a missing witnesses' [sic] testimony is from the defendant, this Court views the claims of ineffective assistance with great caution.'" Id. (quoting Sayre v. Anderson, 238 F.3d 631, 636 (5th Cir. 2001)). A defendant's failure to present some evidence from the uncalled witness regarding that witness's potential testimony and willingness to testify is usually fatal to an ineffective assistance of counsel claim. Id.; see also Alexander v. McCotter, 775 F.2d 595,

602 (5th Cir. 1985).  Whether to call a witness to testify at trial is generally a strategic decision by counsel. See Strickland, 466 U.S. at 689 ("the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"); United States v. Harris, 408 F.3d 186, 190-91 (5th Cir. 2005) (failure to call witness whose testimony cumulative and irrelevant not ineffective assistance). Armstrong has not established that counsel's failure to call unnamed witnesses and experts constituted deficient performance.

  2.  *Counsel prevented Armstrong from testifying at trial*

Within Armstrong's claims is his assertion that trial counsel prevented him from testifying at trial. Armstrong claims that *after* he told the Court he had decided not to testify, during the lunch recess he changed his mind, advised counsel he changed his mind, and counsel refused to put him on the witness stand after lunch. D.E. 70 at 5. Armstrong further claims he was threatened to keep him from testifying.[3] D.E. 69 at 21.

The Court notes that Armstrong makes several contradictory claims: Armstrong suffered from diminished capacity, was not competent to stand trial, his counsel should have known that, and counsel was ineffective because he failed to recognize these deficits. Additionally, Armstrong claims that he was too afraid to testify to the "truth" about how he was set up and by whom until he was moved into the federal BOP which did not occur until *after* he was sentenced. See D.E. 70 at p. 3. At the same time, Armstrong  claims his counsel was ineffective because he prevented Armstrong, who was allegedly incompetent, from testifying.

---

[3]   Armstrong claims he was threatened in pretrial detention and while awaiting sentencing. He now feels safe enough to reveal these facts because he is in a federal facility in Florida. At sentencing, Armstrong claimed that he injured his arm while in jail because he fell. He did not claim any kind of purposeful violence directed at him. Armstrong claims that his son was murdered as a warning to Armstrong to remain silent. The PSR reflects that Armstrong's wife has three adult children who do not live at home. D.E. 35 at ¶ 83. It further reflects that Armstrong does not have children of his own. Id. at ¶¶ 83-84.

Criminal defendants have the right to testify in their own defense. <u>Rock v. Arkansas</u>, 483 U.S. 44, 51–53 (1987). Only the defendant may waive this well-established right. <u>United States v. Brown</u>, 217 F.3d 247, 258 (5th Cir. 2000). When a defendant claims that trial counsel interfered with his right to testify and was thus ineffective, the claim is governed by the <u>Strickland</u> standard. <u>United States v. Harris</u>, 408 F.3d 186, 192 (5th Cir. 2005); <u>United States v. Mullins</u>, 315 F.3d 449, 452–53 (5th Cir. 2002). Assuming, without deciding, that counsel interfered with Armstrong's desire to testify, the Court must consider Armstrong's claim of ineffective assistance under the <u>Strickland</u> standard which requires Armstrong to prove prejudice from counsel's alleged interference with his right to testify.

Armstrong claims he could have explained that he did not recognize the photographs of J&D Produce; he could not have seen the marijuana that was loaded because of the way the load was packaged; he had a history of nervous disorders; he relied on his assistant to read the paperwork; and he was duped. Many of these facts were elicited at trial from other witnesses.

Wanda Byrd, Armstrong's assistant, testified that Armstrong could not read and hired her to help him. Armstrong and she were new to the business and not familiar with bills of lading. She did not recognize the photographs of J&D Produce and did not know what the trailer contained, other than as written on the bill of lading.  Through cross-examination, counsel elicited testimony from Border Patrol Agents suggesting that a reasonable person would not have been able to detect the marijuana within the load either visually or by smell. Armstrong's testimony on these issues would have been cumulative. <u>See</u> <u>Harrison</u>, 496 F.3d at 428; <u>Harris</u>, 408 F.3d at 190-91 (failure to call witness to give cumulative testimony not ineffective assistance).

Other circumstantial evidence suggested that Armstrong knew that the load included marijuana or other contraband. Armstrong picked up two different loads before going to the

checkpoint, but did not know either location. His bill of lading was false and he was provided with only one bill of lading for two different loads from different locations. The quantity of marijuana was large, approximately 2500 pounds, and valuable.

The jury took less than an hour to convict Armstrong. See Minute Entry September 10, 2010, D.E. 55 at 151 (jury out from 1:52 p.m. until 2:25 p.m.). The jury's assessment of the credibility of Armstrong's theory would likely not have been changed by Armstrong's testimony. In light of the facts of this case, Armstrong has not shown a reasonable probability that the outcome of his trial would have differed if he had testified. No ineffective assistance is shown.

3. *Failure to investigate location where Armstrong loaded*

Armstrong also complains that counsel did not investigate where he loaded his trailer and failed to investigate the GPS in the trailer. But Armstrong does not state how determining the location(s) where he loaded the truck would have helped him, since those locations were not J&D Produce. No matter where Armstrong loaded, he still had a false bill of lading and nearly 2500 pounds of marijuana.

4. *Failure to file motion to suppress*

Armstrong complains that counsel did not file a pretrial motion to suppress, but Armstrong does not identify the subject matter or basis of any pretrial motion to suppress that he claims should have been filed. Border Patrol Agent Garcia testified at trial that Armstrong consented to the x-ray of his trailer. That evidence was not controverted and Armstrong admits he consented to the search. D.E. 70 at 7. After his arrest, Armstrong declined to answer questions and gave no statement to the government. Under these circumstances, there was nothing to be suppressed. Counsel is not ineffective when he fails to file a frivolous motion. See United States v. Preston, 209 F.3d 783, 785 (5th Cir. 2000) (citing Green v. Johnson, 160 F.3d 1029, 1037 (5th

Cir. 1998) ("[F]ailure to make a frivolous objection does not cause counsel's performance to fall below an objective level of reasonableness").

5. *Failure to seek plea agreement and § 5K1.1 downward departure*

Armstrong claims that counsel never sought or presented a plea offer. The record does not reveal what plea discussions took place, if any. Armstrong's failure to state that he would have pled guilty had counsel negotiated a plea agreement fails to assert a claim of ineffective assistance. See Missouri v. Frye, — U.S. ---- 132 S.Ct. 1399, 1409 (2012) ("defendants must demonstrate a reasonable probability they would have accepted the [] plea offer had they been afforded effective assistance of counsel.").

Armstrong also complains that counsel did not seek a § 5K1.1 downward departure for substantial assistance. Armstrong was willing to talk to the government after trial. Sentencing counsel represented to the Court that Armstrong had debriefed. At that time, while represented by sentencing counsel, Armstrong did not admit his complicity in the transportation of marijuana. The government, according to sentencing counsel, was not interested in Armstrong and did not believe he could provide substantial assistance unless he admitted his own guilt. Based upon this record, it appears that counsel attempted to qualify Armstrong for substantial assistance, but due to Armstrong's conduct, he did not qualify.

6. *Failure to assert defenses*

      a. Failure to assert duress defense

Armstrong claims that counsel failed to present a duress defense due to counsel's conflict of interest. He claims that failure constituted ineffective assistance of counsel.

Armstrong claims both that he was duped into carrying contraband as part of what he believed to be a legitimate load of produce for Mr. West and he was subject to duress. In support of his claim of duress, Armstrong asserts that his family received threats and his stepson was murdered. He claims that his stepson's murder was to "convey a message not to speak out." D.E. 70 at p. 4. Armstrong claims he told his trial counsel that he received threats and that his stepson was murdered as part of this ongoing campaign. Armstrong claims that "Had Mr. Armstrong not been in fear for his son and spouse's life, his testimony would have exonerated him and convicted others." Id. Armstrong further claims he was attacked in pretrial detention, "suffered brutal physical abuse, and was given the message he could be 'got to' at any time, thus to be silent about 'Mr. West.'" Id. at p. 6. Armstrong claims he attended the proceedings with a swollen and painful arm and was undergoing withdrawal from the withholding of prescribed medication. Id. Armstrong also claims that he wanted to debrief, but before that happened, he was again attacked in prison and his trial counsel was retained by "Mr. West." Id. at p. 7. Armstrong claims that Agent DeLuna threatened Armstrong after he was arrested. Id.

Duress is a recognized affirmative defense to criminal prosecution and the burden of proof is on the defendant to prove by a preponderance of evidence the following elements,

> 1. The defendant was under an unlawful present, imminent, and impending threat of such a nature as to induce a well-grounded fear of death or serious bodily injury to himself [or to a family member]; and

> 2. The defendant had not recklessly or negligently placed himself in a situation in which it was probable that he would be forced to choose the criminal conduct; and

3. The defendant had no reasonable legal alternative to violating the law, that is, he had no reasonable opportunity to avoid the threatened harm; and

4. A reasonable person would believe that by committing the criminal action he would directly avoid the threatened harm.

Fifth Circuit Pattern Jury Instructions: Criminal § 1.36 (West 2001); see also United States v. Francisco, 2012 WL 5872589, *7 (5th Cir., Nov. 21, 2012) (designated unpublished) (reciting elements); United States v. Posadas-Rios, 158 F.3d 832, 873 (5th Cir. 1998) (same).

Armstrong claims that he did not know that someone else arranged for his cargo to contain marijuana. He alleges an elaborate scheme of threats from multiple sources, including the involvement of a Border Patrol agent, to pressure him and his wife into remaining silent *after* the marijuana was discovered.[4] The defense of duress is based upon threats of imminent harm *before the criminal act* to cause someone to commit a crime, not to cover up a crime after it was committed. See Fifth Circuit Pattern Jury Instructions: Criminal § 1.36 (4).

Even if everything Armstrong claims is true and counsel could have elicited evidence to prove it at trial, the circumstances do not fit the requirements of duress. Counsel was not ineffective because he failed to raise a defense or request a jury instruction for which there was no evidence.

---

[4]   Armstrong claims Border Patrol Agent DeLuna threatened him to keep him from talking after Armstrong was arrested and while he was in an interview room at the Border Patrol Checkpoint. Yet, after Armstrong was convicted, Armstrong's wife wrote to the Court on Armstrong's behalf, requesting a meeting with Agent DeLuna "to provide pertinent information concerning my case." D.E. 32. The letter Armstrong authorized his wife to write on his behalf contradicts his claimed fear of DeLuna in this proceeding.

b. <u>Failure to assert other defenses</u>

Although Armstrong claims that counsel did not assert any of five defenses available to him, Armstrong does not identify those defenses, other than duress. Armstrong's trial counsel prepared a lack of knowledge defense that he executed at trial. Armstrong's claim as to the remaining defenses fails to state any facts and is thus conclusory. Conclusory allegations on critical issues in a § 2255 proceeding are insufficient to raise a constitutional issue. <u>United States v. Woods</u>, 870 F.2d 285, 288 n. 3 (5th Cir. 1989); <u>see also</u> <u>United States v. Jones</u>, 614 F.2d 80 (5th Cir. 1980) (failure of movant to state specific facts, "is insufficient to state a constitutional claim."). Armstrong failed to sufficiently allege that counsel's failure to investigate the facts of his case, thereby preventing counsel from putting on a defense, constituted ineffective assistance of counsel.

7. *Miscellaneous complaints*

In addition to the complaints addressed, Armstrong also complains that counsel was ineffective on the grounds that he failed to effectively cross-examine Border Patrol Agents, establish which agent broke the seal on the trailer door, and counsel failed to establish that Armstrong had a nervous condition that would have explained his actions at the checkpoint. Armstrong fails to explain what facts he expected counsel to elicit, how the cross-examinations were deficient, and how any of the action he criticizes would have helped him. As a result these allegations are conclusory and do not state a constitutional violation. <u>Woods</u>, 870 F.2d at 288 n. 3; <u>Jones</u>, 614 F.2d at 81 (failure of movant to state specific facts, "is insufficient to state a constitutional claim.").

As to Armstrong's claim that he had a nervous disorder that counsel should have brought to the jury's attention, any testimony regarding that condition would likely have also resulted in testimony regarding Armstrong's abuse of prescription drugs. Assuming Armstrong talked with

trial counsel about this issue, counsel may well have made a strategic decision not to pursue that line of testimony. Trottie v. Stephens, 720 F.3d 231, (5th Cir. 2013) ("[T]he failure to present a particular line of argument or evidence is presumed to have been the result of strategic choice."); see Woods v. Thaler, 399 Fed. App'x. 884,  896 (5th Cir., Oct. 25, 2010) (per curiam) (designated unpublished) (evaluating strategy advocated on post-conviction review that carried substantial risks and holding counsel's decision not to pursue strategy was not ineffective assistance); Rector v. Johnson, 120 F.3d 551, 564 (5th Cir. 1997) (counsel's decision not to pursue and present potential mitigating evidence on the grounds that it is double-edged in nature is objectively reasonable and not ineffective assistance). Armstrong has not met his burden to demonstrate that counsel's decision not to present this evidence was professionally unreasonable.

9. *Counsel failed to recognize and investigate Armstrong's diminished capacity*

Armstrong claims he was not fit to stand trial because his mental capacity was diminished by legally administered prescription drugs. Armstrong both claims that his diminished mental capacity made it easy for him to be duped and misled, as well as prevented him from assisting his counsel and standing up for his rights. D.E. 71 at 2. Armstrong reminds the Court that he was in special education classes and cannot read or write. Id.

Armstrong's PSR reflects that before his arrest, Armstrong had ongoing physical pain caused by arthritis and inflammation in his shoulder. He was prescribed Percocet and Zanaflex for pain and to help him sleep in 2008. Armstrong's April 2010 medical records indicated that he took Chantix for smoking cessation, Xanax, Wellbutrin, Temezapan, Ambien, Zanaflex, Percocet, and Hydocodone. D.E. 35 at ¶ 88. During his PSR interview, Armstrong admitted that he abused Percocet and Xanax by taking more than the recommended dosage. Id. at ¶ 90.

Armstrong provided prison medical records in further support of his claims. D.E. 71. The medical records provided reflect that in March 2011, six months after Armstrong was tried, and

after he was transferred to the Bureau of Prisons, the medical professional who took Armstrong's medical history wrote that Armstrong had a "long history of anxiety disorder that inmate reports has been treated with benzodiazepines for 20+ years. *Was taken off in jail and had other meds substituted*." D.E. 71 at 12 (emphasis added). The examination reflected that he "appears well, NAD, Alert and Oriented x3, Obese." Id. He had moderate anxiety, panic attacks, sleep impaired, restless/fidgety. Id.

In a June 2011 evaluation, Armstrong was diagnosed with "Anxiety State, unspecified," Antisocial personality disorder, Essentially Healthy, GAF 51-70, all of which were chronic conditions. He was also shown to be suffering from "Depressive disorder, not elsewhere classified that is temporary/acute." Id. at 23.

There is nothing in the record that identifies Armstrong's medication at time of trial. At sentencing, three months after trial, Armstrong testified that he was taking "a heart medicine and something to keep me calmed down." D.E. 56 at 3. He also testified,

> 25 THE COURT: Does that, either one of those medicines
> 1 interfere with your ability to think or concentrate?
> 2 THE DEFENDANT: No, ma'am. No, Your Honor.
> 3 THE COURT: You're clear-headed today? That's all
> 4 right. I just expect that from the lawyers. Are you
> 5 clear-headed today?
> 6 THE DEFENDANT: Yes, Your Honor.
> 7 THE COURT: They make their living here.
> 8 THE DEFENDANT: I'm nervous.

Id. at 4. Armstrong testified that he was competent, understood the PSR, that he discussed it with counsel who answered all his questions. Id. at 3, 9. Armstrong's counsel agreed with Armstrong's assessment of his competence. Id. at 3. Armstrong's responses to the Court did not reveal any problems with his mental capacity either at sentencing or during the trial. Armstrong's complaint that trial counsel was ineffective because he did not recognize or investigate his diminished capacity is not supported by the evidence.

Armstrong further claims that his diminished capacity was a basis for a downward departure at sentencing. See D.E. 70 at 8. A downward departure may be warranted "if the defendant committed the offense while suffering from a significantly reduced mental capacity." U.S.S.G. § 5K2.13. A "significantly reduced mental capacity" is defined in the application notes as a "significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful." U.S.S.G. § 5K2.13 Application Note 1. "The court may not depart below the applicable guideline range if (1) the significantly reduced mental capacity was caused by the voluntary use of drugs or other intoxicants." U.S.S.G. § 5K2.13.

Nothing in the record suggests that Armstrong did not understand that transporting large quantities of marijuana was criminal or that he was unable to control his behavior, nor does Armstrong claim he did not know that transporting large quantities of marijuana was wrong. Counsel was not ineffective for his failure to seek leniency at sentencing based upon a theory that has no support in the evidence.

6. *Claim that counsel failed to recognize Armstrong's lack of competence to stand trial*

Armstrong claims that counsel failed to appreciate that Armstrong was not competent to stand trial and that failure constituted ineffective assistance of counsel. D.E. 69 at 17.

The standard for determining competency is whether a preponderance of the evidence establishes that the defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational as well as factual understanding of the proceedings against him." Dusky v. United States, 362 U.S. 402, 402 (1960) (per curiam); see also United States v. Dockins, 986 F.2d 888, 892 (5th Cir. 1993).

Armstrong's responses to the Court during trial and at sentencing evidenced an understanding of the proceedings. At sentencing, counsel testified that Armstrong was able to

discuss the nature and consequences of the charge against him and assist him with possible defenses. D.E. 56 at 3. Armstrong does not point to any evidence, other than that discussed in subsection IV(B)(5), supra., that should have alerted his trial counsel to Armstrong's alleged incompetence to stand trial. Armstrong's claim that counsel was ineffective because he failed to notice that Armstrong was incompetent to stand trial is conclusory and not supported by the record. Woods, 870 F.2d at 288 n. 3; Jones, 614 F.2d at 81.

**D.      Claim Appellate Counsel was Ineffective**

Armstrong finally complains that appellate counsel was ineffective. D.E. 69 at 20, 21. In his supporting memorandum of law, Armstrong criticizes the brief for raising only one issue, citing only two cases, and providing few record cites. D.E. 70 at 2. Armstrong also seems to criticize counsel's failure to file a reply brief or to file a petition for writ of certiorari. Id. Armstrong does not state what other issues counsel should have raised, why filing a reply brief would have made any difference, or how a petition for writ of certiorari would have helped him.

In order to make a claim of ineffective assistance on appeal, Armstrong must establish that counsel's conduct was deficient and establish prejudice by showing that the Fifth Circuit would have granted relief if the appeal had not been deficient. See Phillips, 210 F.3d at 350. To show prejudice, Armstrong must explain what issues he could have prevailed on and why.  See id. He has not done so. As a result, his claim of ineffective assistance of appellate counsel is conclusory and fails to sufficiently allege a claim of ineffective assistance. See Woods, 870 F.2d at 288 n. 3; see also Jones, 614 F.2d at 80, 81.

**E.      The Court and Government Ignored Armstrong's Lack of Competence to Stand Trial**

Armstrong claims that in addition to counsel's failure to observe that Armstrong was not competent to stand trial, the government and the Court also ignored his lack of competence.

Armstrong did not speak to government agents after his arrest and invoked his right to counsel. During arraignment in July 2010 conducted by a federal Magistrate Judge, Armstrong responded appropriately to the Magistrate Judge's questions, testified that he understood the charge against him, understood the maximum punishment he faced, denied any recent mental health treatment, denied he was on any medications that affected his mental health, and his appointed counsel stated that Armstrong was competent. July 2, 2010, ERO 10:34:14-10:38:25. During trial and at sentencing, Armstrong responded appropriately and testified that he was competent. His sentencing counsel agreed.

Armstrong does not point to any evidence the government had before trial that should have alerted the government or the Court to Armstrong's alleged incompetence to stand trial. Armstrong's claim is conclusory due to its lack of factual specificity and is otherwise unsupported by the record. Woods, 870 F.2d at 288 n. 3; Jones, 614 F.2d at 81.

**F.      Request for Evidentiary Hearing**

Armstrong's motion requests an evidentiary hearing. D.E. 69 at 13. A hearing is not necessary when the motion, the files and the record of the case conclusively show that the movant is not entitled to relief on the allegations before the Court. See Friedman v. United States, 588 F.2d 1010, 1015 (5th Cir. 1979); accord United States v. Samaniego, — Fed. App'x. ----, 2013 WL 3226840 at *4 (5th Cir., Apr. 24, 2013) (per curiam) (designated unpublished). Because Armstrong has not sufficiently alleged several of his claims for relief and the remaining claims are unsupported by the record, the Court finds that no evidentiary hearing is necessary.

## VI.  CERTIFICATE OF APPEALABILITY

An appeal may not be taken to the court of appeals from a final order in a habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1)(A). Although Armstrong has not yet filed a notice of appeal, the § 2255 Rules

instruct this Court to "issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11, § 2255 Rules.

A COA "may issue. . . only if the applicant has made a substantial showing of the denial of a constitutional right."   28 U.S.C. § 2253(c)(2). "The COA determination under § 2253(c) requires an overview of the claims in the habeas petition and a general assessment of their merits." Miller-El v. Cockrell, 537 U.S. 322, 336 (2003).

To warrant a grant of the certificate as to claims denied on their merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000). This standard requires a § 2255 movant to demonstrate that reasonable jurists could debate whether the motion should have been resolved differently, or that the issues presented deserved encouragement to proceed further.  United States v. Jones, 287 F.3d 325, 329 (5th Cir. 2002) (relying upon Slack, 529 U.S. at 483-84).    As to claims that the district court rejects solely on procedural grounds, the movant must show both that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Slack, 529 U.S. at 484 (emphasis added).

Based on the above standards, the Court concludes that Armstrong is not entitled to a COA on his claim. That is, reasonable jurists could not debate the Court's resolution of his claim, nor does the issue deserve encouragement to proceed. See Jones, 287 F.3d at 329.

## VII.  CONCLUSION

For the foregoing reasons, Armstrong's motion for appointment of counsel (D.E. 70) is DENIED, his motion to vacate, set aside or correct his sentence (D.E. 69) is DENIED; and he is also DENIED a Certificate of Appealability.

SIGNED and ORDERED this 10th day of October, 2013.

_____
Janis Graham Jack
Senior United States District Judge